IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:22-cr-00016-RK |
| ) | |
| MICHAEL W. SYLVARA, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Before the Court is Defendant Michael W. Sylvara's "Motion to Dismiss with Prejudice and Alternative Motion for New Trial" ("Motion"). (Doc. 196.) The Motion is fully briefed. (Docs. 204, 208.) After careful consideration, Defendant's Motion is **DENIED**.

### Background

In 2016, Defendant became representative payee for his father's Social Security Administration ("SSA") benefits. (Doc. 200 at 27.) A representative payee is a volunteer who manages a beneficiary's funds while they are incapable of doing so. (*Id.* at 17.) Defendant was his father's SSA representative payee from December 2016 until May 2019. (Doc. 200 at 27, 55.)

Defendant's father, Stewart Sylvara, received benefits under both the Supplemental Security Income Program ("SSI") and the Social Security Disability Insurance Program ("SSDI"). SSDI benefits are available to people who have developed a disability and have paid Social Security taxes, whereas SSI provides beneficiaries "the bare minimum, poverty level funds to survive" and they are "reserved for those people that haven't paid into the [Social Security] system or haven't done enough work credits to qualify for" SSDI. (Doc. 200 at 18-19.)

Stewart Sylvara was awarded his SSDI and SSI benefits in late 2016, and they were backdated to his 2015 applications. On January 4, 2017, he received a lump-sum back payment of his SSDI benefits for $8,739, and on February 22, 2017, he received a lump-sum back payment of his SSI benefits for $11,573. (Doc. 201 at 230, 243.) Stewart Sylvara never received monthly SSI benefit disbursements because, at some point between 2015 and 2017, he became eligible for SSDI benefits. At that point, his eligibility for SSI benefits ended. (Doc. 200 at 19-20.) He did receive monthly SSDI payments of approximately $1,700 from late 2016 until his death in November 2019. (*See id.* at 28; Doc. 201 at 241.) All of Stewart Sylvara's SSA benefits were

deposited into an Academy Bank account that was titled "Michael W. Sylvara as representative payee for Stewart W. Sylvara." (Doc. 201 at 229-30.)

***The First Trial***

On January 25, 2022, Defendant was indicted and charged with one count of Social Security fraud in violation of 42 U.S.C. § 408(a)(5) based on his alleged conversion of at least $42,369 of his father's SSDI benefits. (Doc. 1.)

Defendant was not charged with misuse of his father's SSI benefits. However, the Government filed a notice of intent to offer Defendant's alleged conversion of his father's SSI benefits as evidence of Defendant's knowledge, intent, common scheme, and absence of mistake or accident under Federal Rule of Evidence Rule 404(b). (Doc. 81.) In its Rule 404(b) motion, the Government expressed that it "anticipates presenting evidence showing the SSI payment of $11,573 was deposited into the same representative payee account the defendant established to receive SSDI benefits, that the defendant was the only person with control over this account, and that both the SSDI and SSI payments were converted to uses other than to meet his father's needs." (*Id.* at 3-4.) At the pretrial conference, the Court ruled that the proposed Rule 404(b) evidence was admissible. (Doc. 193 at 15.) Defendant proposed a limiting instruction which the Government agreed to. (*Id.* at 15; Doc. 98 at 30.)

Defendant's jury trial commenced on October 3, 2022. Government witness Lori Nelson, Financial Analyst for the U.S. Attorney's Office ("Nelson"), testified about SSA benefit deposits made into the representative payee account, as well as many checks, cash withdrawals, bill payments, and transfers from the account by Defendant. (Doc. 103 at 91-137.) Shortly after the representative payee account was opened, two lump-sum payments were deposited into the representative payee account—$8,739 on January 4, 2017, and $11,573 on February 22, 2017. (*Id.* at 92, 104.) Thereafter, Stewart Sylvara received $1,709 per month. (*Id.* at 101.) From January through March 2017, Defendant made several withdrawals or transfers into his personal account of amounts over or near $1,000: $2,200 on January 9; $1,000 on January 11; $3,300 on January 17; $1,000 on January 25; $2,000 on February 27; $1,000 on March 7; $5,500 on March 14; and $900 on March 28. (*Id.* at 92, 105-06.) Thereafter, the withdrawals continued, but in smaller amounts. Agent Don Krahn, Special Agent for the SSA ("Agent Krahn"), testified about his investigation of Defendant for Social Security fraud which began in 2019.

Defendant testified that he and his father had an agreement under which his father would pay Defendant a portion of his benefits. Part of this agreement was repayment for money Defendant had spent on his father's food and shelter before benefits began flowing (from approximately March to December 2016). (Doc. 104 at 403). And, part of the agreement was an hourly arrangement under which Stewart Sylvara would pay Defendant to care for him moving forward. (*Id.* at 402-05.)

At the close of evidence, the Rule 404(b)-limiting instruction was provided to the jury. (Doc. 98 at 30.) The jury was unable to reach a verdict, and the first trial ended in a mistrial. (Doc. 95.)

**The Second Trial**

On November 18, 2022, Defendant was charged in a superseding indictment with the same Social Security fraud charge as the first indictment (Count One), theft of government money in violation of 18 U.S.C. § 641 (Count Two),[1] and two counts of false declarations before the Court in violation of 18 U.S.C. § 1623(a) (Counts Three and Four). (Doc. 105.) Count Four was dismissed on the Government's motion prior to trial. (Doc. 133.) Count Three was premised on Defendant's alleged false testimony during his first trial about the existence of a written agreement under which his father would compensate Defendant from his Social Security benefits.

Prior to the second trial, the Government filed a notice of intent to offer Rule 404(b) evidence based on the receipt of SSI funds and again used the same language in the motion—that it anticipated presenting evidence "that both the SSDI and SSI payment were converted to uses other than to meet his father's needs." (Doc. 163.) Defendant's counsel did not object to the Rule 404(b) motion, and it was sustained by the Court during the pretrial hearing. (Doc. 199 at 4.)

Similar to the first trial, Nelson testified about Social Security benefit deposits made into the representative payee account, as well as many checks, cash withdrawals, bill payments, and transfers from the account by Defendant. (Doc. 201 at 231-65.)

Agent Krahn also testified again. Agent Krahn explained, among other things, credits Defendant received for money he appropriately spent for his father's care while he was his representative payee. (Doc. 200 at 55.) In May 2019, SSA requested that Defendant account for how he had been managing his father's SSDI benefits. (*Id.* at 44.) Defendant provided SSA a Form SSA-795 "Statement of Claimant or Other Person" certifying how Stewart Sylvara's benefits

---

[1] Like Count One, Count Two alleged misuse of SSDI benefits.

3

were expended. (Trial 2, Gov. Ex. 7.) The form contained a breakdown of expense categories including food, rent, utilities, clothing, and miscellaneous items.[2] (*Id.*; Doc. 200 at 46-48.) The form requested proof of expenditures. (*Id.*) Defendant provided estimates for each category, most of which were ranges of dollar amounts. Using the low-end calculations, the expenditures amounted to $1,107. (*Id.*) Using the high-end calculations, the expenditures amounted to $2,057. (*Id.*) Agent Krahn explained:

> Social Security was trying to determine how much of the funds that was paid to Michael was used on behalf of Stewart or wasn't used on behalf of Stewart [sic]. And when Michael submitted this document saying he had spent "X" amount per month, Social Security essentially gave him credit for it, what he reported on that document as his monthly expenses. So, they deducted that amount from the total amount paid and said he used "X" amount for Stewart, but we still have this remaining amount that's unaccounted for.

(Doc. 200 at 55.)

The jury found Defendant guilty of Count One and Count Three. (Doc. 172.) Prior to sentencing, the United States Probation and Pretrial Services Office ("Probation Office") issued a presentence investigation report ("PSR"). (Doc. 182.) The Probation Office determined a six-level increase to Defendant's offense level applied based on the loss amount of more than $40,000 but less than $95,000 under U.S.S.G. § 2B1.1(b)(1)(D). (*Id.* at 11.) The Probation Office determined that the "total loss amount and restitution amount owed to the Social Security Administration is $42,369 due to the defendant's misuse of benefit payments owed to Stewart Sylvara." (*Id.* at 11.) The Probation Office reasoned:

> In November 2021, the Social Security Administration sent the defendant a document stating that he would need to return/pay back $42,369 in benefits paid out for Stewart Sylvara. The document indicated that of the $70,332 total payout to Stewart Sylvara, during the time frame in which the defendant was the representative payee, only $28,363 could reasonably be accounted for as being used towards the care of Stewart Sylvara.

(*Id.* at 9.)

Defendant objected to the Probation Office's loss amount calculation, arguing that based upon the Government's evidence of monetary credits given to Defendant for money appropriately spent on care of his father (or the amount accounted for), the loss amount was only $35,527. (Doc.

---

[2] Defendant certified he expended the funds on behalf of his father as follows: $300 to $500 for food, $457 for rent, $150 to $300 for utilities, $50 to $300 for clothing, $150 to $500 in miscellaneous expenses. (Trial 2, Gov. Ex. 7.)

4

187 at 2-3.) The Government agreed with the Probation Office's fraud loss calculation. (Doc. 188 at 9.) The Government stated, "In preparation for sentencing[,] the government obtained documentation regarding SSA's loss calculation." (*Id.*) That documentation was attached to the Government's sentencing memorandum ("Attachment 1"). (Doc. 188-1.) Attachment 1 was not disclosed to Defendant prior to either trial. The Government explained its calculation of the loss amount:

> SSA determined the loss due to the defendant's fraudulent scheme is $42,369. (PSR ¶ 17.) In total, Stewart Sylvara received $70,732 in SSA benefits while the defendant was his father's representative payee. *Id.* This total amount, $70,732, was comprised of $58,271 in [SSDI] payments and $12,461 in [SSI]. The SSDI payments were deposited into the representative payee account monthly. The SSI funds were deposited into the representative payee account in a lump-sum payment in February 2017. The SSA determined that only $28,363 of the total amount paid could reasonably be accounted for as being used towards the care of Stewart Sylvara. (PSR ¶ 17.) [At sentencing, SSA Senior Policy Expert] will explain that the $28,363 amount the SSA credited to the defendant was comprised of $15,902 in SSDI benefits and the entire $12,461 of SSI benefits paid to Stewart Sylvara.

(Doc. 188 at 9.)

Attachment 1 lists "total payment" and "misuse" amounts for the SSDI and SSI benefit claims. (Doc. 188-1.) For Stewart Sylvara's SSDI benefits from November 15, 2016, to May 7, 2019, Attachment 1 lists the total payment amount as $58,271 and the total misuse amount as $42,369. For his SSI benefits, Attachment 1 lists the total payment amount as $12,461[3] and the total misuse amount as $0. Attachment 1 also provides:

> Michael Sylvara misused $42,369.00 in Social Security Disability benefits issued to him on behalf of Stewart Sylvara from 11/2016-05/2019. Michael was only able to reasonably account for $28,363.00 in expenses for Stewart. The bank statements provided by the low-income housing manager showed multiple suspect withdraws, and with the limited amount of receipts provided for the accounting period, we are unable to determine if additional expenses are justifiably for Stewart Sylvara. Stewart did acknowledge two payments of 160.00 for food in 2019 which were applied to the accounted for funds and 17 dollars for the criminal background check application. ***It is determined that all of the SSI funds are accounted for as well as $15,902.00 of the [SSDI] benefits.*** Michael Sylvara misused $42,369.00 in

---

[3] Stewart Sylvara applied for SSA benefits in 2015; however, his application was initially denied. An attorney assisted him in an appeal of that decision. The Government represents that Stewart Sylvara was awarded $12,461 in back payment, but $888 was deducted "to pay back the lawyer who assisted [him] in obtaining the SSI benefit." (Doc. 204 at 3.) The Court is unable to verify the Government's representation because the supporting documentation cited has not been provided to the Court (either at trial or attached to its briefing). Stewart Sylvara actually received $11,573 deposited into the representative payee account.

5

[SSDI benefits]. SSA will request restitution in the amount of $42,369.00 from Michael Sylvara.

(Emphasis added.)

Defendant moves the Court to dismiss the superseding indictment all together, or in the alternative, dismiss the superseding indictment and grant a new trial on the original, single-count indictment.[4] (Doc. 196.)

## Discussion

Defendant argues that the Government's failure to disclose Attachment 1 prior to each trial infringed on his due process right to a fair trial in violation of *Brady v. Maryland*, 373 U.S. 83, 86 (1963). (Doc. 196.) Specifically, Defendant argues that the statement, "It is determined that all of the SSI funds are accounted for as well as $15,902.00 of the [SSDI] benefits," was favorable and its suppression undermines confidence in the outcomes of Defendant's trials.

Suppression of exculpatory evidence violates the Due Process Clause of the Fourteenth Amendment. *Brady*, 373 U.S. at 86. "Prosecutors commit a *Brady* violation when they withhold evidence from the defense that is (1) favorable to the accused and (2) material either to guilt or to punishment." *United States v. Corey*, 36 F.4th 819, 822 (8th Cir. 2011) (citation omitted). This rule includes impeachment and exculpatory evidence. *United States v. Tyndall*, 521 F.3d 877, 881 (8th Cir. 2008) (citation omitted).

While the Government concedes that Attachment 1 was suppressed, it argues Attachment 1 was not favorable to Defendant or material to the outcome of either trial because the fact that the SSA determined that Defendant had not improperly converted the *SSI* benefits was "not favorable in answering the ultimate issue of the trials: whether the defendant converted a portion of his father's *SSDI* benefits." (Doc. 204 at 10 (emphasis added).)

Defendant argues that Attachment 1 is favorable evidence because the Government used the proposition that Defendant converted his father's SSI payments as Rule 404(b) evidence to "encourage[] the jury to use this evidence as his state of mind and absence of mistake in allegedly stealing the [SSDI] benefits, too." (Doc. 196 at 9.) As the Court addresses in more depth, *infra*, while the Government filed notices of intent to offer Rule 404(b) evidence, it did not actually offer or introduce Rule 404(b) evidence or argument at either trial. Attachment 1 is arguably

---

[4] Defendant initially claimed the Government also improperly withheld a fax cover sheet from the SSA file; however, in his reply, Defendant concedes that the fax cover sheet was timely produced and therefore withdraws his argument as to that evidence. (Doc. 208 at 10.)

6

unfavorable to Defendant to the extent that it more succinctly lays out the SSA's calculation and reasoning for its determination that Defendant converted $42,369 of his father's SSDI benefits. Without Attachment 1, the Government had only oral testimony from Agent Krahn concerning the SSA's calculation—but, Agent Krahn did not do the calculation, he merely reviewed what the SSA calculated during his fraud investigation. (Doc. 201 at 91.)

Even assuming that Attachment 1 is favorable to Defendant, the Court finds that it is not material. "Evidence is material 'when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Corey*, 36 F.4th at 822-23 (quoting *Turner v. United States*, 582 U.S. 313, 324 (2017)). "A 'reasonable probability of a different result' is one in which the suppressed evidence 'undermines confidence in the outcome of the trial.'" *Id.* at 823 (quoting *Turner*, 582 U.S. at 324).

Defendant argues that Attachment 1 is material to his case in four ways: (1) if produced, the Government would not have had grounds to file its Rule 404(b) notices; (2) evidence that the SSI lump-sum payment was not misused would have supported his defense with respect to the agreement; (3) disclosure would have undercut the government's arguments that large cash withdrawals signaled theft by Defendant; and (4) Defendant could have impeached Agent Krahn's testimony. The Court addresses these arguments in turn.

Defendant argues that if he were aware that the SSA had determined that the SSI funds were accounted for, the Government would not have been able to utilize the alleged SSI payment conversion as Rule 404(b) evidence to show knowledge, motive, intent, common scheme, and absence of mistake or accident. While the Government filed notices of intent to offer Rule 404(b) evidence, it did not actually offer evidence or argument suggesting that the SSI payment was converted to uses other than to meet Defendant's father's needs, and consequently was evidence suggesting Defendant converted the SSDI payments. During the first trial, the Court did provide the jury a Rule 404(b) limiting instruction; however, the extent to which the Government addressed the SSI payment in the first trial was particularly minor, if at all. Agent Krahn explained generally what the SSDI and SSI programs are. (Doc. 103 at 6-8.) Both sides presented evidence of back payments made in early 2017, including deposits of $8,739 and $11,573 from the SSA, but the benefit source of those payments (SSDI versus SSI) was not discerned. (*See* Doc. 103 at 22, 104-05; Doc. 104 at 403, 407-09.) Moreover, during closing arguments in the second trial, the Government reiterated to the jury that Defendant was "not being prosecuted for SSI fraud or

7

anything related to" those benefits. (Doc. 202 at 403.) And, the Government recognized that there was evidence that Defendant and his father had an agreement wherein Defendant would receive some of his father's backpay, but it was the Government's position that the agreement did not exceed the $11,573 SSI payment and therefore withdrawals exceeding that amount and continuing into 2018 and 2019 represented improper conversions of Stewart Sylvara's SSDI benefits. (*Id.* at 401-03.) Finally, the jury was not provided the Rule 404(b)-limiting instruction in the second trial as it was in the first trial, a fact which further supports the absence of Rule 404(b) evidence at trial. The Court rejects the notion that Attachment 1 was material to either trial based on the Government's notices of intent to offer Rule 404(b) evidence.[5]

Defendant next argues that evidence that the SSI payment was not misused would have supported his defense which relied on the agreement with his father. Defendant asserts it is material as to Count One for Social Security fraud because "[e]vidence the [SSA] had determined the entire SSI payment was properly accounted for would have suggested it concluded there was a valid agreement as to the SSI benefits [and] the jury could have considered this in deciding whether [Defendant] believed in good faith the agreement extended to the disability benefits." (Doc. 196 at 9-10.) However, as discussed above, the first jury was never asked whether Defendant possessed a good faith belief that the agreement regarding his father's SSI benefits extended to his SSDI benefits because a distinction between his father's SSI and SSDI benefits was never made during the first trial.[6]

In contrast, during the second trial, substantial evidence was provided from which the jury could find an agreement between Defendant and his father for repayment of his living expenses from the SSI payment. Renee Saure, Representative Payee Coordinator for SSA, testified that a beneficiary receiving SSI can enter into an agreement to pay back a third party who paid for the beneficiary's food and shelter prior to receiving SSI benefits. (Doc. 201 at 182-83.) Likewise, Agent Krahn testified that he was aware of an agreement between Defendant and Stewart Sylvara

---

[5] Defendant does not argue in his Motion that evidence of the SSI deposit was otherwise inadmissible, nor does he contest the Government's suggestion that evidence of the SSI lump-sum payment was also admissible to explain the existence of a $11,573 deposit when the jury considered the representative payee account statements.

[6] Defendant cites to his Exhibits 511 and 524 to support the statement that the SSA "records included evidence of an agreement," but those exhibits were not admitted during the first trial. (Doc. 196 at 9-10.)

to repay Defendant for Stewart's food, shelter, and a portion of utility bills. (*Id.* 112-14.) Agent Krahn explained that Defendant or his father submitted a Form SSA-L5063 to the SSA certifying that there was an agreement between them providing that Stewart would repay Defendant for "food and/or shelter" while he was waiting for his SSI application to be approved. (*Id.* at 83-85; Trial 2, Def. Ex. 518.) The completed form, however, could not be located by the SSA during Agent Krahn's investigation, or for trial.[7] (Doc. 201 at 85-86.) Thus, Agent Krahn testified that he did not know the amount Defendant was to be paid, but he stated that the agreement "couldn't be more than the SSI" payment because agreements for repayment of representative payees are not permitted under the SSDI program. (*Id.* at 119.) Agent Krahn testified that even in the absence of this completed form, there is further evidence of an agreement concerning the SSI benefits because Stewart Sylvara received the maximum available SSI benefit amount (rather than receiving a reduction based upon his living expenses). (*Id.* at 83-84.) SSA records also demonstrated the existence of an agreement in that Stewart Sylvara's SSI application indicated he had an agreement to pay back Defendant for his share of household expenses, that they were "going to figure out what" he owed later, and he would "pay it out of [his] SSI or other income." (Def. Exs. 511, 534.) Finally, although not evidence, the Government reiterated to the jury during closing arguments that Defendant was "not being prosecuted for SSI fraud or anything related to" those benefits. (Doc. 202 at 403.)

Because the jury was well aware of evidence surrounding the SSI repayment agreement (and therefore evidence that the SSI payment was properly accounted for), Attachment 1 would not have added any new information for the jury's consideration. *See Corey*, 36 F.4th at 823 (During trial on a drug distribution conspiracy, "[b]ecause the jury was well aware of [another drug trafficker's] involvement in the trafficking conspiracy, the DEA affidavit [concerning that trafficker's activity in the operative location] would not have added any new information," and therefore was immaterial to the outcome of the trial.). Defendant does not offer any support for his contention that the jury did not consider this evidence in deciding whether Defendant had a good faith belief that the agreement extended to the SSDI payments. Defendant's assertion that

---

[7] Defendant's Exhibit 524, a fax cover sheet, was admitted at trial. The note on the fax cover sheet states "LOAN VERIFICATION FOR SHELTER" and is dated December 13, 2016. (Trial 2, Def. Ex. 524.) Testimony at trial explained that the document attached to the fax cover sheet was the completed Form SSA-L5063, and it was scanned into SSA's computer filing system when it was returned to SSA. (Doc. 202 at 302-04.)

9

Attachment 1 was also material to his false declarations charge, "given how bound up" this charge was with the Social Security charge, is rejected on the same basis. (Doc. 196 at 10.)

Defendant also argues that disclosure of Attachment 1 would have undercut the Government's argument that cash withdrawals from the account signaled theft because the largest cash withdrawals occurred in the month following the lump-sum SSI disbursement. (Doc. 196 at 10.) Defendant seems to suggest that if the jury heard that the SSI disbursement was accounted for, that it could disregard the large cash withdrawals made in the month following the February 22, 2017, SSI payment. (*Id.*) The Court disagrees that the evidence was material for this purpose. At both trials, Defendant claimed that the cash withdrawals from the representative payee account were permitted under the agreement as payment for his father's care. (Doc. 104 at 404-05; Doc. 202 at 310, 405-09). The presence of Attachment 1 would not have altered or bolstered that explanation. Moreover, Defendant's materiality argument is refuted by evidence presented at each trial that even before the SSI payment was deposited, Defendant was making large cash withdrawals from the representative payee account, which at that time only contained the SSDI payment. On January 4, 2017, Stewart Sylvara's $8,739 SSDI back payment was deposited in the account. (Doc. 103 at 92; Doc. 201 at 230.) Between January 4 and February 22, 2017 (when the SSI back payment was deposited), Defendant initiated $7,547 in withdrawals from the representative payee account—including three check withdrawals of $2,200; $3,300; and $1,000 on January 9, 11, and 17, respectively, and a $1,000 transfer to Defendant's personal banking account. (Gov. Ex. 55; Doc. 103 at 93-94; Doc. 201 at 231, 236-38, 243-44.) Thus, even had Attachment 1 been available to Defendant, he would still need to explain the large cash withdrawals of SSDI funds in January 2017.

Finally, Defendant argues that disclosure of evidence indicating that the SSI funds were accounted for would have impeached Agent Krahn's testimony during the first trial. Specifically, Defendant claims he could have impeached Agent Krahn's testimony about the amount the SSA credited Defendant which was "clearly inconsistent with" Attachment 1, reflecting that $15,902 of the SSDI benefits were accounted for. (Doc. 196 at 11.) Defendant argues this impeachment would have "undercut both Agent Krahn's credibility and the reliability of his investigation." (*Id.*) However, the Court finds that Defendant did impeach Agent Krahn's testimony, and therefore the evidence was also not material for this purpose.

On direct examination during the first trial, Agent Krahn testified to the monetary figures on Defendant's completed Form SSA-795, and he explained that Defendant failed to provide much proof by means of receipts, bank statements, or other documentation for the relevant time period. (Doc. 103 at 47.) Agent Krahn testified that the SSA gave Defendant "full credit" for "for what he stated he spent the money for." (*Id.*) Defendant provided estimates for each category on the form, most of which were ranges of dollar amounts. Using the low-end calculations, the expenditures amounted to $1,107. (*Id.*) Using the high-end calculations, the expenditures amounted to $2,057. (*Id.*) Correspondence between the SSA and Defendant introduced at trial reflected that the SSA told Defendant the following:

> Documentation was not provided to account for all of the Social Security money we sent to you on Stewart Sylvara's behalf. The evidence indicates only $28,363 of the $70,732 in total benefits can reasonably be accounted for during the time period November 2016 to May 2019. Bank statements show expenditures that did not benefit Stewart Sylvara.

(Doc. 103 at 48.)

On cross-examination, Defendant's counsel pointed out that Agent Krahn's suggestion that Defendant was given "full credit" for the Form SSA-795 amounts was inaccurate:

> **Defendant's Counsel:** So, we're going to start with [the Form SSA-795]. So, you're saying that . . . the reason why he has a $42,000 debt is because he couldn't bring you receipts, right? He couldn't provide the Social Security Administration receipts, correct?
>
> **Agent Krahn:** Correct.
>
> **Defendant's Counsel:** And on his documentation, [Form SSA-795], he provides several amounts that you say he was given credit for, correct?
>
> **Agent Krahn:** Correct.
>
> **Defendant's Counsel:** And, if you add all of those up, it comes out to a little bit over $1,800 a month, correct? You can take your time and add them, if you like. I did it from the high end.
>
> **Agent Krahn:** I was closer to $2,000.
>
> **Defendant's Counsel:** Okay. So, closer to $2,000, which is above the $1,700 [] Stewart Sylvara was getting for his monthly benefit, correct?
>
> **Agent Krahn:** Correct.

> **Defendant's Counsel:** So, it's not correct that [Defendant] was getting credit for $2,000 a month. He was not, was he?
>
> **Agent Krahn:** I'm not sure if he got credit for $2,000 a month. I would have to add up the numbers monthly.
>
> **Defendant's Counsel:** Okay. Let's do that.
>
> **Agent Krahn:** Okay.
>
> **Defendant's Counsel:** He was his representative from November of 2016 until May of 2019, correct?
>
> **Agent Krahn:** Yes.
>
> **Defendant's Counsel:** So that's, say, the two years of [2017 and 2018], that's twenty-four months, right?
>
> **Agent Krahn:** Correct.
>
> **Defendant's Counsel:** Plus November and December of [2016], that's twenty-six months, correct?
>
> **Agent Krahn:** Correct.
>
> **Defendant's Counsel:** And then for -- until May, that's five more months, thirty-one months, right?
>
> **Agent Krahn:** Correct.
>
> **Defendant's Counsel:** So, if we [multiply] the thirty-one [months] times the $2,000 [credit], then he would be getting credit for $62,000, correct?
>
> **Agent Krahn:** That sounds about right.
>
> **Defendant's Counsel:** All right. But the [SSA] is saying that he's only going to get credit for $28,363, correct?
>
> **Agent Krahn:** Correct.

(Doc. 103 at 63-64.)

Defendant claims he could have impeached Agent Krahn's testimony with Attachment 1 because it stated that $15,902 of the SSDI funds (and all of the SSI funds) had been accounted for (or, credited); yet, Defendant's counsel successfully pointed out that it could not be accurate that the SSA gave him $2,000 in monthly credits because that would amount to $62,000 in credits for

12

the time Defendant was representative payee and the SSA only credited him $28,363. (Doc. 103 at 64.) In light of this testimony, the Court finds that any further impeachment evidence made possible by the statement on Attachment 1 would have been cumulative and not material such that it "could reasonably be taken to put the whole case in such a different light as to undermine confidence" in the jury's inability to reach a unanimous decision. *United States v. Robinson*, 809 F.3d 991, 997 (8th Cir. 2016) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)); *see also Pederson v. Fabian*, 491 F.3d 816, 826 (8th Cir. 2007) (impeachment value of evidence was largely cumulative and therefore of limited value to defendant).[8]

In summary, the Court questions the favorability of Attachment 1, given that the document appears to more efficiently explain the Government's theory. In any event, because Defendant has not shown a reasonable probability that the outcome of his trials would have been different had Attachment 1 been available to him, the Court concludes that Attachment 1 was not material to the outcome of either of Defendant's trials. Accordingly, no *Brady* violation occurred. Defendant's Motion is **DENIED**.

## Conclusion

After careful consideration and for the reasons explained above, the Court **ORDERS** that Defendant's Motion is **DENIED**.

**IT IS SO ORDERED.**

                                                        s/ Roseann A. Ketchmark
                                                       ROSEANN A. KETCHMARK, JUDGE
                                                       UNITED STATES DISTRICT COURT

DATED: October 1, 2024

---

[8] Defendant only cites to testimony from his first trial. In any event, the Court notes that during the second trial, Agent Krahn testified that Defendant was credited approximately $28,000, a figure that corresponds to the credit amount provided in Attachment 1. (Doc. 201 at 88-89; *see* Attachment 1 (providing that $28,363 was reasonably accounted for).) Agent Krahn acknowledged on cross-examination that even though Defendant reported that Stewart's monthly expenses were between $1,000 and $2,000 per month, Defendant was not credited that amount for each of the months he served as representative payee. (Doc. 201 at 88-89, 127-28.)